## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| Avraham Eisenberg<br><br>          Plaintiff,<br><br>v.<br><br>Numeris Ltd., Sasha Ivanov,<br>and DOES 1-10<br><br>          Defendants | Civil Action No. <u>3:22-cv-1325</u> |

## PLAINTIFF'S ORIGINAL COMPLAINT

Avraham Eisenberg ("Plaintiff") files this Complaint against Defendants, on personal knowledge as to Plaintiff's own activities, and on information and belief as to the activities of others:

### Nature of the Case

1.      This is a case where a Puerto Rican trader is having his investment stolen by an international Ponzi scheme and bait-and-switch scam. Although the technology involved in this scam is new, the core modus operandi is not: Defendants convinced Plaintiff to deposit approximately $14,500,000 worth of commodities with them by promising him that there would be no withdrawal limits. However, it was later discovered that Defendants had been running their business as a Ponzi scheme and using investors' assets to buy up the underlying commodity so that they could sell it all at an inflated price. When this scheme was exposed, Defendants reduced their

1

rates, causing Plaintiff and their other victims to lose tens of thousands of dollars a day. Defendants then changed the rules of Plaintiff's account to prevent him from withdrawing his commodities, and have even threatened to seize Plaintiff's deposits under a provision for the automatic liquidation of "unhealthy" accounts—despite the fact that it was Defendants' misconduct that caused the price fluctuations that rendered Plaintiffs' account (and those of Defendants' other victims) "unhealthy."

2.      In short, Defendants ran a global Ponzi scheme to fund a pump-and-dump scheme, and this scheme ensnared an investor here in Puerto Rico. Worse, when Defendants were caught, they used the problems caused by their exposure as a pretext to keep Plaintiff from withdrawing his wealth so they could seize it for their own use.

## The Parties

3.      Plaintiff is an individual with a principal residence in San Juan, Puerto Rico.

4.      The currently-known defendants ("Defendants") are, on information and belief, individuals and businesses residing in foreign jurisdictions, and Plaintiff currently has no knowledge as to the physical location or identities of Does 1-10.

5.      Defendants conduct illegal operations through the use of blockchain technology and associated trading platforms to consumers within the United States and its territories, including in Puerto Rico. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

6.      On information and belief, Defendants are an interrelated group working in concert to knowingly and willfully engage in improper and illegal conduct.

7.      The true identities of many of these Defendants are presently unknown. As the identities of the now-unknown Defendants become known, Plaintiff will promptly amend this Complaint to identify them.

## Jurisdiction and Venue

8.      This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because those claims include claims under the Commodity Exchange Act ("CEA").

9.      This Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367 because all claims herein are so related that they arise from the same case or controversy.

10.     This Court also has federal diversity jurisdiction over all of Plaintiff's claims in this Complaint pursuant to 28 U.S.C. §1332, as the parties are diverse in citizenship and the amount in controversy exceeds $75,000.00. Plaintiff does not reside in the same state as any of the defendants and the amount of damages claimed is more than $75,000.00.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants are entities or individuals subject to personal jurisdiction in this District, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

12.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(c)(3) because defendants not residing in the United States may be sued in any judicial district.

## Background Facts

13.    Blockchain technology is a type of data structure that uses encryption and linked digital blocks to create, *inter alia*, a verifiable, undisrupted chain of transaction/data history. Transactions on most blockchain systems are simultaneously anonymous and publicly verifiable, recording an anonymized address or wallet identifier that can be tracked even when the real-world identity of the owner remains unknown.

14.    The most prominent uses involving blockchain technology involve smart contracts—computer programs running on a blockchain network which execute automatically when specific conditions are met. The smart contract's parameters for execution of a given function or transaction are encoded into the smart contract, and thus typically no program, organization, or person has discretion about whether, how, or to what extent to execute the smart contract.

15.    Decentralized finance, also known as "DeFi," mimics traditional finance mechanisms, but it differs in important philosophical and mechanical ways from such traditional mechanisms. DeFi includes financial exchanges and lending platforms which allow participants to trade financial products with one another using blockchains and smart contracts running on them. Blockchain-based lending platforms in particular aim to provide incentives to both borrowers and lenders while purporting to democratize access to investment opportunities compared to loan processes in traditional finance institutions. Smart contracts for a platform reside on the associated blockchain using code (also known as the "protocol") viewable by all of

the platform's users (or potential users) so that such users know what the risks and benefits of participation in the platform should be. Changes to the code require a majority vote of the users with voting rights—often any user who owns tokens coupled with governance tokens, or tokens bearing voting rights.

16.     In DeFi lending protocols, lenders deposit digital assets into a protocol's liquidity pool in exchange for interest and, usually, protocol-specific tokens to track their ownership and potentially vote on changes to the protocol's code. Borrowers post digital assets as collateral to withdraw up to a limit of other tokens or digital assets at a set interest rate applied against the borrowed value. Providing incentives and utility to borrowers and lenders plays an essential role in DeFi lending platforms.

17.     As a result of the public nature of the code for governance and maintenance of a given liquidity pool protocol, lenders and borrowers know what their expected return will be on deposited collateral and what their cost will be on borrowed assets. Borrowers are often required to overcollateralize their positions in a liquidity pool by depositing assets whose total value exceed the value of borrowed assets. Then, if the value of the collateral falls below a pre-set threshold, the user's collateral becomes subject to automatic liquidation based on the parameters of the applicable smart contract.

18.     The democratic nature of protocol governance dictates that proposed amendments beneficial to a protocol's users will usually pass, while those benefiting only a few users and detrimental to a majority of users will fail. In either event, the promise and utility of liquidity pools and other DeFi endeavors rely on the concept of

an open environment not subject to manipulation or unilateral change at great cost to the many for the benefit of a very few.

19.     Defendant Ivanov is the principal and, upon information and belief, founder of the Waves blockchain protocol ("Waves"), which has a native token known as "Neutrino" bearing the ticker symbol USDN ("USDN"). USDN is represented by Waves to be a stablecoin pegged to the United States Dollar, meaning that its value is intended to always be equal to one dollar. Waves also acts as a "bridge," which generally is a system for moving assets between different blockchains. In this instance, Waves allows for moving assets between the well-known Ethereum blockchain and the Waves blockchain. It does so by assigning each user with a unique address on the Ethereum blockchain to which the user can deposit assets, after which the Waves protocol credits the user's Waves account with those assets.

20.     Running on top of the Waves protocol is the Vires, or Vires.finance, liquidity protocol ("Vires"), a DeFi lending protocol which is "provided by" Defendant Numeris. Through Vires, lenders can deposit digital assets—mainly USDN, but also other cryptocurrencies—for a return, and borrowers can borrow those deposited assets for a charge.

21.     Users who lend through Vires obtain VIRES tokens, which they may "lock," committing not to sell or liquidate those tokens in exchange for two main benefits. First, locking grants the owner of the locked tokens a share of the protocol's revenue stream from various markets transacted through Vires, including USDN, Bitcoin, and Ethereum, among others. Second, it also "upgrades" VIRES tokens to gVires,

giving the owner voting power in proportion to their respective share of the total gVires population. Though holders of gVires are ostensibly members of the Vires DAO (decentralized autonomous organization) (the "<u>DAO</u>"), upon information and belief the DAO is actually owned and controlled almost entirely by only a very few individuals, including Defendant Ivanov, without substantive decisionmaking power by users outside of Defendant Ivanov's inner circle.

22.     In September 2021, Defendant Ivanov, using Twitter Handle @sasha35625, tweeted that Waves was "really thirsty" for liquidity and touted annual percentage yields for Vires lenders between 30-70%.[1] In October 2021, Vires publicized that "every decision made is to be voted through on-chain governance," which it extolled as "pure DeFi governance."[2] In March 2022, Vires' total value locked (the value of locked assets) exceeded $1.5 billion USD, a fact which Vires used to flaunt its use case as allowing users to "take over-collateralized loans so they could free up capital to deploy elsewhere."[3]

23.     In March 2022, Plaintiff began seeing references to Waves and Vires and began researching them for himself. Plaintiff opened positions on Waves and Vires at the end of March 2022, ultimately depositing approximately $14,500,000 worth of USDC, which is also known as USD Coin and is a well-known stablecoin pegged to the US Dollar. There were no withdrawal limits at the time—a fact on which Plaintiff relied

---

[1] https://twitter.com/sasha35625/status/1440609781421535249
[2] https://medium.com/vires-finance/vires-finance-tokenomics-and-roadmap-4ef88d2f29ec
[3] https://www.bloomberg.com/press-releases/2022-03-24/vires-finance-and-parent-blockchain-waves-announce-1-5-billion-tvl

in deciding to open positions on Waves and Vires. If Plaintiff had so desired, he could have withdrawn his entire position at any time of his choosing.

24.     When Plaintiff opened his positions—and to this day—Defendant Numeris and its principals represented to Vires users, including Plaintiff, that:

a. "The Company has no control over any transactions over the Company decentralized non-custodial liquidity protocol, the method of payment of any transactions or any actual payments of transactions."[4]

b. "The Protocol is fully decentralized and managed by a decentralized community of gVires token-holders (Vires DAO), who propose and vote on upgrades to the Protocol."[5]

c. "Vires DAO's Governance framework allows participation in shaping the direction of the Protocol. Anybody with 1000 gVIRES can propose a governance action."[6]

d. "If you borrow digital assets from the Vires Protocol, you will have to supply digital assets of your own as collateral. If your collateral declines in value such that it is no longer sufficient to secure the amount that you borrowed, others may interact with the Vires Protocol to seize your collateral in a liquidation event. You further acknowledge that **we** are not responsible for any of these variables or risks, **do not own or control the Vires Protocol**, and cannot be held liable for any resulting losses that you experience while accessing or using the Interface."[7] (emphasis added)

e. "The risks related to the vires.finance protocol are mostly smart contract risks (risk of a bug within the protocol code) and liquidation risk (risk on the collateral liquidation process)."[8]

f. "VIRES locking reflects your commitment to the protocol governance. Therefore, it grants you the ability to make decisions."[9]

---

[4] https://docs.vires.finance/g1/terms-of-use
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] https://docs.vires.finance/faq/w-governance

25.   On March 31, 2022, Twitter user @0xHamZ tweeted that Waves is a Ponzi scheme, stating that Waves/Vires' principals had "recklessly engineered price spikes by borrowing USDC at 35% to buy its own token."[10] In other words, according to @0xHamZ, Waves/Vires' principals drove up the price of Waves' own token by buying it with USDC borrowed at high interest rates. This ultimately created deficiencies in Vires' users' "account health," which threatened to cause automatic liquidation of their pledged collateral. @0xHamZ's tweet sent shockwaves throughout the Waves/Vires community.

26.   In response to the uproar around @0xHamZ's revelation of the price manipulation scheme, Defendant Ivanov proposed and implemented changes to the Vires protocol that limited maximum borrower APR to 40% for all assets (the "Rate Reduction Proposal").[11] Another proposal also passed that set daily withdrawal limits for USDT, another stablecoin known as "Tether," and USDC (the "Withdrawal Limit Proposal") based on the allegation that "new deposits/repays do not cover the demand [for withdrawals]."[12] Under the Withdrawal Limit Proposal, no user address could withdraw more than 1000 USDT and 1000 USDC per day.[13]

27.   Prior to the Rate Reduction Proposal, USDC lending yields on Vires were approximately 72% APY and USDN borrowing charges were approximately 11%, which meant a user could borrow USDN at only 11% to purchase and then lend USDC

---

[10] https://twitter.com/0xHamz/status/1509581295621451779
[11] https://forum.vires.finance/t/set-maximum-borrow-apr-to-40/375
[12] https://vires.finance/governance/vote/Cu7sbih8fS9FRbynGBfWBTqUZKrJ7GMBP 8LsTL4AfAC5
[13] *Id.*

72%, netting approximately 61% "profit." With the subsequent rate reductions, however, users like Plaintiff lost, and continue to lose, tens of thousands of dollars a day compared to what they were promised and, oftentimes, what they bought into.

28.     Still in the throes of popular upheaval in the Waves/Vires community, Defendant Ivanov again waded into Twitter to confess his responsibility and attempt yet another conciliation, ostensibly to keep the community from taking legal action:



Defendant Ivanov, in the same thread, detailed a plan to take on many of the accounts with the lowest account health — in other words, acting as a third-party liquidator. Defendant Ivanov also admitted that he ultimately controls the DAO by stating without qualification or reservation how the DAO will vote to change USDN integration on Vires, or in other words, to again amend the Vires protocol and the parameters by which it is (or is not) bound. Clearly many of the votes to restrict withdrawals and limit the interest lenders received were not, in fact, cast by the "democratized" nature of "pure DeFi governance." Instead, the DAO is controlled by

---

[14] https://twitter.com/sasha35625/status/1529076417731997699

a disproportionate share of votes to enact protocol revisions that benefit the few apex holders of gVires who control the DAO.

29.     Waves' own "masterplan" admits that this is the case, confessing to the public that "it is unfair that most users have to suffer due to a few large whales abusing the system," while at the same time suggesting that Defendant Ivanov should be given even more control over the entire Waves/Vires ecosystem.[15]

30.     The APR reduction under the Rate Reduction Proposal prevented Plaintiff from voluntarily liquidating his accounts, which he would have done if not for the APR reduction. Then, the Withdrawal Limit Proposal added insult to injury by wholly prohibiting Plaintiff from having any control over his own assets, contrary to the terms to which Plaintiff agreed when he opened his position. All of these losses and restrictions have been imposed on Plaintiff and countless other users at the hands of Defendants for Defendants' own financial gain and as a direct result of their manipulation of the system they created.

31.     In short, Plaintiff deposited 12,000,000 USDC, which with interest is now approximately 12,718,495 USDC, but which Plaintiff cannot access or withdraw due to Defendants' actions. Defendants enticed victims such as Plaintiff by offering high interest rates, but used their own coin—USDN—as collateral to borrow heavily in order to ultimately buy up Waves to artificially drive up its price. After converting the purchased Waves to USDN and yielding hundreds of millions in USDN, Defendants borrowed against the USDN knowing it had no backing, much like the

---

[15] https://medium.com/wavesprotocol/the-waves-defi-revival-plan-c21d9bfabc7e

widely known recent collapse of Terra and its stablecoin, TerraUSD (ticker symbol: UST). When its victims caught on, Defendants then changed the protocol rules to prevent the lenders from withdrawing their capital, and dramatically reduced the rates the lenders receive. If Defendants had not changed the rates, the lenders— including Plaintiff—would be able to withdraw their capital, which they cannot now do. As a result, Plaintiff has been damaged in the amount of approximately 12,718,495 USDC, or $12,718,495.

32.     Plaintiff has no adequate remedy at law.

## COUNT ONE
## PRICE MANIPULATION

33.     Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

34.     "It [is] unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance." 7 U.S.C. § 9(1).

35.     "While the CEA itself does not define the term, a court will find manipulation where '(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *BMA LLC v. HDR Global Trading Ltd.*, 2021 WL 949371, *13 (quoting *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013)).

36.    Here, Defendants possessed an ability to influence the market price of Waves' token by buying it at high interest rates, and they did in fact do so.

37.    At the time Plaintiff opened his positions with Defendants, an artificial price existed for that token.

38.    As noted, Defendants deliberately caused this artificial price by buying up Waves' token at high interest rates, and did so with the specific intention to cause the artificial price. This intention can be seen in the Defendants' extensive efforts to buy up Waves' token, which can have no innocent explanation, as well as Defendants' subsequent efforts to seize Plaintiff's investment.

39.    As a result of this manipulation, Plaintiff has lost hundreds of thousands of dollars and is now in a position where Defendants threaten to misappropriate his remaining investment of over a million dollars.

40.    Plaintiff is therefore entitled to relief in full under the Commodity Exchange Act.

**COUNT TWO**
**CIVIL CONSPIRACY**

41.    Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

42.    "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages . . . [and constitutes]

an actual abridgment of some federally-secured right." *Hernandez-Cuevas v. Taylor*, 2014 WL 12626352, *2 (D.P.R. Sept. 17, 2014) (internal quotations omitted).

43.    On information and belief, Defendants have conspired to benefit only themselves by driving up the price of their Waves' token by buying it with USDC borrowed at unreasonably high interest rates, which created deficiencies in Vires' users' "account health" and threatened to cause automatic liquidation of users', including Plaintiff's, pledged collateral. The subsequent Rate Reduction Proposal and Withdrawal Limit Proposal imposed by Defendants ostensibly in response to the resulting liquidity shortage caused by Defendants' acts ultimately prevented Plaintiff from making the value growth he otherwise would have made and from being able to access and withdraw his assets to invest elsewhere.

44.    Defendants' conspiracy not only damages Plaintiff's ability to make money, but Defendants are denying Plaintiff the right of reasonable access to his property and the right to liquidate his accounts.

45.    Plaintiff is therefore entitled to recover from Defendants' abridgment of his federally-secured right to use and access his property.

### COUNT THREE
### FRAUDULENT MISREPRESENTATION

46.    Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

47.    "[C]ourts will not allow directors or officers to use the corporate shield to protect them while they use the corporation to defraud others. Where the directors or officers use the corporation to commit fraud, courts will pierce the corporate veil and

14

hold those officers or directors personally liable. *Wadsworth, Inc. v. Schwarz-Nin*, 951 F. Supp. 314, 322 (D.P.R. 1996) (internal quotations omitted). "A plaintiff hoping to persuade a court to pierce the corporate veil must establish that the directors acted with intent to defraud and that the creditor cannot collect from the corporation the debt owed them." *Id.*

48.     "To state a claim for fraud under Puerto Rico law, a plaintiff must allege '(1) that a false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the plaintiff.'" *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico* F. Supp. 3d, 2021 WL 7162427, *8 (D.P.R. Dec. 27, 2021) (citing *Microsoft Corp. v. Comput. Warehouse*, 83 F. Supp. 2d 256, 262 (D.P.R. 2000) and *Wadsworth, Inc. v. Schwarz-Nin*, 951 F. Supp. 314, 323 (D.P. R 1996)).[16] Federal Rule of Civil Procedure 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." The plaintiff must "specify the who, what, where, and when of the allegedly false or fraudulent representation." *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004). "In general, in order to prove an intent to defraud, a plaintiff must show either that the defendant intended to receive a benefit or intended to cause actual or potential loss to the plaintiff." *Wadsworth, Inc. v. Schwarz-Nin*, 951 F. Supp. 314, 326–27 (D.P.R. 1996).

---

[16] The plaintiff must also "set[] forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013).

49.    Defendants falsely represented that APYs from Vires would be between 30-70%.

50.    Defendants falsely represented that Vires has no control over any transactions over its decentralized non-custodial liquidity protocol, the method of payment of any transactions, or any actual payments of transactions.

51.    Defendants falsely represented that the Vires Protocol is fully decentralized and managed by a decentralized community of gVires token-holders who propose and vote on upgrades to the Protocol.

52.    Defendants falsely represented that they did not own or control the Vires Protocol.

53.    Defendants falsely represented that Plaintiff would have full and unrestricted access to his virtual assets through his dealings with Defendants.

54.    Plaintiff reasonably and foreseeably relied on Defendants' fraudulent representations. Defendants' misrepresentations and omissions concerning their clients' ability to recoup loans at an 72% APY rate and withdraw assets are material—a reasonable customer or investor would consider it important to know if he or she would be unable to recoup loans at an advertised APY rate and withdraw his or her assets on demand. Defendants' omissions and failure to disclose their misappropriation is material: a reasonable customer or investor would want to know if his or her assets were misappropriated or unduly restrained.

55.    Defendants reduced the maximum borrower APR to 40% for all assets, which reduced Plaintiff's lending yields by 32%. Further, Defendants set daily withdrawal

limits on Plaintiff's virtual assets after Plaintiff deposited his assets with Defendants. Plaintiff's reliance on Defendants' fraudulent representations therefore resulted in substantial and mounting damages to Plaintiff. Plaintiff's damages also include Plaintiff's inability to use and enjoy full access to its financial assets.

56.     Defendants knew the above statements were false when making them, and intended for Plaintiff to rely on Defendants' false statements in order to gain substantial control over, and restrain Plaintiff's access to his virtual assets.

57.     As a direct and proximate result of the Defendants' fraudulent conduct, Plaintiff has been harmed and is entitled to damages:

      a.   Plaintiff is entitled to recovery of his anticipated profits from the APYs in place prior to Defendants' manipulation of the Vires system.

      b.   Plaintiff is entitled to recovery of additional damages as this Court considers just to penalize Defendants for their fraudulent representations and mismanagement of Plaintiff's assets.

58.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has sustained and will continue to sustain substantial and irreparable injury, for which there is no adequate remedy at law. Unless Defendants' fraudulent conduct is enjoined by this Court, Defendants will continue to wrongfully restrain Plaintiff's assets and deny Plaintiff from recouping profits at the APY Rate Plaintiff was reasonably expecting. Plaintiff therefore is entitled to permanent injunctive relief restraining and enjoining Defendants' ongoing fraudulent conduct.

59.     Defendants are jointly and severally liable.

## COUNT FOUR
## FRAUDULENT INDUCEMENT

60.    Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

61.    A claim for fraudulent inducement requires the same elements discussed above: "(1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud." *Stockdale v. Doral Fin. Corp.*, 2009 WL 3066638, *15 (D.P.R. Sept. 18, 2009).

62.    By virtue of Defendants' tortious acts stated above, Defendants are liable to Plaintiff for Fraudulent Inducement.

## COUNT FIVE
## DOLO

63.    Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

64.    "Under Puerto Rico contract law, fraud that affects a contracting party is commonly referred to as 'dolo' or deceit . . . dolo and fraud are not synonymous concepts, as 'Puerto Rico's Supreme Court has described dolo as the genus and fraud as one of its several species alongside with deceit, false representations, undue influence, and other insidious machinations.'" *Burk v. Paulen*, 100 F. Supp. 3d 126, 134 (D.P.R. 2015) (citing *Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler Corp.*, 92 F.Supp.2d 8, 19 (D.P.R.2000)). Like fraud, dolo "is not presumed," and a plaintiff alleging dolo "need not strictly adhere" to the traditional elements of

fraud, as "dolo can be found to exist without a finding of all of the necessary facts constituting fraud." *Id*. at 135. Plaintiff must, however, "sufficiently plead that [the defendant] acted with intentional fault or bad faith to deceive him when discussing the formation of an agreement between the parties." *Id*.

65.     By virtue of Defendants' tortious acts stated above, Defendants are liable to Plaintiff for Dolo.

## COUNT SIX
## NEGLIGENT MISREPRESENTATION

66.     Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

67.     To prove negligent misrepresentation, a plaintiff must prove that: "(1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation." *Adrian v. Mesirow Fin. Structured Settlements, LLC*, 736 F. Supp. 2d 404, 421 (D.P.R. 2010).

68.     By virtue of Defendants' tortious acts stated above, Defendants are liable to Plaintiff for Negligent Misrepresentation.

**COUNT SEVEN**
**CONVERSION**

69.   Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

70.   "Under Puerto Rico law, conversion is not the simple acquisition of another's property, but the malicious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment." *United States v. GZ Constr. St, Inc.*, 155 F. Supp. 3d 147, 152 (D.P.R. 2015) (internal quotations omitted).

71.   Defendants' enactment of the strictures laid out in the Withdrawal Limit Proposal constitues conversion, as the Defendants have maliciously and wrongfully assumed authority over Plaintiff's property—depriving Plaintiff of his right to possess, use, and enjoy said property.

**COUNT EIGHT**
**UNJUST ENRICHMENT**

72.   Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

73.   There are five elements to an unjust enrichment cause of action. These include: "1) existence of enrichment; 2) a correlative loss; 3) nexus between loss and enrichment; 4) lack of cause for enrichment; and 5) absence of a legal precept excluding application of enrichment without cause." *AIG Ins. Co.-Puerto Rico v.*

*PetSmart Puerto Rico, LLC*, 2021 WL 4598107, *8 (D.P.R. May 20, 2021) (internal brackets omitted).

74.    By virtue of Defendants' tortious acts stated above, including Defendants' driving up the price of their Waves' token by buying it with USDC borrowed at unreasonably high interest rates, Defendants have been unjustly enriched.

## COUNT NINE
## PROMISSORY ESTOPPEL

75.    Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

76.    "According to the First Circuit's interpretation of Puerto Rico's adoption of the doctrine of promissory estoppel through judicial decisions, the first essential element of promissory estoppel is a binding offer in the form of a promise. This promise must be definite and certain so that the promisor should reasonably foresee that it will induce reliance by the promisee or a third party." *Int'l Paper Co. v. Farm Credit Corp.*, 760 F. Supp. 18, 20 (D.P.R. 1991) (citing *Santoni v. Fed. Deposit Ins. Corp.*, 677 F.2d 174, 179 (1st Cir. 1982).

77.    Defendants represented to Plaintiff, among other things, that Plaintiff would obtain a beneficial yield of loaned assets around 70%, that Plaintiff would be able to withdraw his assets at any such time and in any such amount as he desired, and that the protocols governing Waves and Vires were democratically controlled rather than by a small, collusive group of people. Plaintiff relied on these representations in deciding to participate in Vires to his detriment.

78.     By virtue of Defendants' tortious acts stated above, Defendants are liable to Plaintiff under the doctrine of promissory estoppel.

## COUNT TEN
## EQUITABLE ESTOPPEL

79.     Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

80.     A plaintiff alleging equitable estoppel must establish that: "(1) the party to be estopped made a definite misrepresentation of fact to another person having reason to believe that the other would rely upon it; (2) the party seeking estoppel relied on the misrepresentations to its detriment; and (3) the reliance was reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Candelario v. Metro. Life Ins. Co.*, 861 F. Supp. 2d 23, 28 (D.P.R. 2012) (internal brackets and quotations omitted). A plaintiff must present evidence showing that the defendant had an 'improper purpose' or 'constructive knowledge of the deceptive nature of his conduct in the form of some definite, unequivocal behavior fairly calculated to mask the truth or to lull an unsuspecting person into a false sense of security.'" *Id.* (citing *Ortega Candelaria,* 661 F.3d 675, 679 (1st Cir. 2011)).

81.     Defendants misrepresented to Plaintiff, among other things, that Plaintiff would obtain a beneficial yield of loaned assets around 70%, that Plaintiff would be able to withdraw his assets at any such time and in any such amount as he desired, and that the protocols governing Waves and Vires were democratically controlled rather than by a small, collusive group of people. Plaintiff reasonably relied on these

misrepresentations in deciding to participate in Vires to his detriment. Moreover, Plaintiff relied on Defendants' misrepresentations and did not know, nor should he have known, that the misrepresentations were misleading.

82.    By virtue of Defendants' tortious acts stated above, Defendants are liable to Plaintiff under the doctrine of equitable estoppel.

### COUNT ELEVEN
### *INDEBITATUS ASSUMPSIT*

83.    Plaintiff repeats and realleges the foregoing allegations above as if fully set forth here.

84.    *Indebitatus assumpsit* is the federal common-law cause of action for money had and received—in order for a plaintiff to sustain the action, it must "establish an express contract or facts and circumstances from which the law will raise an implication of a promise to pay." *Inter-Island Ferry Sys. Corp. v. Puerto Rico Ports Auth.*, 2017 WL 4990556, *5 (D.P.R. Oct. 31, 2017). "More simply put, *indebitatus assumpsit* is a remedy that is only available when there was an express or implied contract between the parties under which one party fully performed and the other has yet to pay." *Id.*

85.    By virtue of Defendants' tortious acts stated above, including but not limited to Defendants' representations through the Waves website, the Vires website, and various blogs and social media announcements by Waves, Vires, and Defendant Ivanov, Defendants are liable to Plaintiff under the doctrine of *indebitatus assumpsit*.

23

**Preliminary Injunction**

86.    Plaintiff is separately filing an *ex parte* Motion for Temporary Restraining Order following this Complaint, requesting that this Court order, among other things, the freezing of all of Plaintiff's assets and preventing Defendants from withdrawing said assets in order to preserve the status quo until such time as a hearing can be held. Without said relief, Defendants' wrongful actions will continue unabated, and Plaintiff will continue to suffer irreparable harm.

**Prayer for Relief**

WHEREFORE, Plaintiff respectfully prays that this Court declare that Defendants' conduct is fraudulent, unlawful, and in violation of legal statutes here identified, and that it grant Plaintiff the following remedies:

1.    That this Court award compensatory and general damages in the amount of **$12,718,495**, as well as any and all consequential damages and lost profits, against all Defendants sued in their individual and/or representative capacities, for the Plaintiff, or an amount to be determined according to proof during the trial, as a remedy for the fraud, breach of contract, and unlawful withholding of money.

2.    That this Court award exemplary and punitive damages, if applicable, against all Defendants sued in their individual and/or representative capacities, in an amount to be determined at trial, in light of Defendants' willful, wanton, and malicious acts with conscious disregard to Plaintiff's rights.

3.    That this Court award Plaintiff his full costs, expenses, and attorney's fees.

4.    Pre-judgment interest and post-judgment interest; and

5.    Any other relief this Court deems equitable, just and appropriate.


Dated: July 6, 2022                               Respectfully submitted,

**Dunlap Bennett & Ludwig PLLC**

By: s/ Cortland C. Putbrese
Cortland C. Putbrese
Puerto Rico Federal Bar No. 305708
8003 Franklin Farms Dr., Suite 220
Richmond, Virginia 23229
Tel.    804.977.2688
Fax    804.977.2680
cputbrese@dbllawyers.com


**Creedon PLLC**

James H. Creedon
Texas Bar No. 24092299
Charles A. Wallace
Texas Bar No. 24110501
5 Cowboys Way, Suite 300
Frisco, TX 75034
Tel.    972.850.6864
Fax    972.920.3290
jhcreedon@creedon.com
cwallace@creedon.com


**Johnson Friedman Law Group,
PLLC**

Samuel H. Johnson
Texas Bar No. 24065507
7161 Bishop Road, Suite 220
Plano, TX 75024
Tel.    214.382.0300
Fax    214.466.2481
sam@jfbusinesslaw.com

ATTORNEYS FOR PLAINTIFF
AVRAHAM EISENBERG

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2022, I caused a true and correct copy of the foregoing to be filed on the Court's CM/ECF system, which served notice on all counsel of record.

By: <u>s/ Cortland C. Putbrese</u>
Cortland C. Putbrese